**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| RYAN D. BURCH, | } | |
| | } | |
| Plaintiff, | } | |
| | } | |
| v. | } | CASE NO. 2:09-cv-1640-SLB |
| | } | |
| P.J. CHEESE, INC., | } | |
| | } | |
| Defendant. | } | |

## <u>MEMORANDUM OPINION</u>

This case is currently before the court on defendant P.J. Cheese Inc.'s ("defendant") Motion for Summary Judgment, (doc. 43).[1]  Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendant's Motion for Summary Judgment, (doc. 43), is due to be granted in part and denied in part.

## I.  <u>SUMMARY JUDGMENT STANDARD</u>

Pursuant to Fed. R. Civ. P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  Once the moving party has met its burden, the non-moving party must go beyond the pleadings and show that there is a genuine issue for trial. FED. R. CIV. P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317,

---

[1] Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in its favor. *See id.* at 255. Nevertheless, the non-moving party "need not be given the benefit of every inference but only of every reasonable inference." *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999) (citing *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988)).

## II.  STATEMENT OF FACTS[2]

### A.    GENERAL BACKGROUND

Ryan D. Burch ("plaintiff"), an African American male, began working for defendant in 1999. (Doc. 8-1 ¶ 1; *see* doc. 1 ¶ 18; doc. 19 ¶ 18.) Plaintiff became General Manager at defendant's Fairfield, Alabama restaurant in September 2004. (Doc. 43-1 at 38:1-3 & 41:6-

---

[2] As required when determining a motion for summary judgment, the court has construed the facts in the light most favorable to plaintiff, the nonmovant. Although the evidence in conflict on issues of fact may be set forth herein, all disputed facts are ultimately resolved in plaintiff's favor, and all reasonable inferences arising from those facts are drawn in her favor. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990); *Zaben v. Air Prods. & Chems., Inc.*, 129 F.3d 1453, 1455 (11th Cir. 1997).

19.)  At all times material to this lawsuit, plaintiff reported to Area Supervisor Robert Offner ("Offner").  (Doc. 43-3 at 10:16-18.)  Plaintiff was the only African American General Manager reporting to Offner.  (Doc. 43-1 at 114:7-9.)

**B.      PLAINTIFF'S FIRST TERMINATION**

On July 18, 2007, plaintiff's brother was murdered not far from the Fairfield restaurant.  (Doc. 8-1 ¶ 3; doc. 43-1 at 55:19-23.)  Plaintiff witnessed his brother lying dead at the murder scene.  (Doc. 8-1 ¶ 3.)  After learning of the incident, Offner instructed plaintiff to take an unspecified amount of time away from work.  (Doc. 43-3 at 73:7-12 & 146:9-12.) Plaintiff was absent from work from July 19, 2007, through August 5, 2007.  (Doc. 48-1 at 3.)  Offner classified plaintiff's absences as vacation time and sick leave to ensure that plaintiff would remain paid during his time off.  (Doc. 43-3 at 73:17-74:4.)

Plaintiff returned to work on August 6, 2007.  (Doc. 48-1 at 3.)  Plaintiff worked seven consecutive days through August 12, was scheduled off the following four days, and was scheduled to return to work on August 17.  (*Id*.)  Although having already returned to work, Offner left plaintiff a message on August 9, telling him that he had received the maximum amount of bereavement leave plus an additional three weeks off, and that he was "expected to be at the restaurant on Saturday at the scheduled time, on time, [in] uniform, ready to run the restaurant."  (Doc. 48-3 at 5-6.)  Offner warned plaintiff, "Failure to do so will result in your termination.  And I will be looking for your keys if you cannot come back in that capacity."  (*Id*. at 6.)

On August 16, 2007, "everything" regarding his brother's death "crashed down" on plaintiff, and he sought medical treatment at American Family Care. (Doc. 43-1 at 138:6-9; *see* doc. 79-9 at 1-3.)  The attending physician was Dr. Thomas Dodd ("Dr. Dodd").  (*See* doc. 79-9 at 1-3.)  Dr. Dodd diagnosed plaintiff with sinus congestion, nasal allergies, anxiety, disturbances of emotion, insomnia, and depression.  (*Id.* at 1 & 3.)  Dr. Dodd noted on plaintiff's Patient Information form: "want p[atient] to take family medical leave due to death in family about a month ago." (*Id.* at 3.)  Dr. Dodd gave plaintiff a signed note titled Certificate of Physician.  (*Id.* at 6.)  Dr. Dodd wrote "Family Medical Leave" under the section "Physician's Comments," and "9/16/07" under the section "Return to Regular Work." (*Id.*)  When asked why Dr. Dodd recommended taking a month away from work, plaintiff testified:

> Well, the doctor examined me.  He said I was very stressed.  The situation was a difficult situation.  I couldn't sleep.  I was very paranoid.  And so he said – asked me pretty much how long I had been on the job, which I told him I had been – been there for a while.  And he said, you need to take this time off.  I'm going to write you an excuse.  You get the Family Medical Leave forms that you need.  That was it.

(Doc. 43-1 at 69:4-14.)  Dr. Dodd prescribed plaintiff Xanax, but plaintiff did not fill the prescription because he was afraid to take the medication.  (*Id.* at 69:15-22; doc. 79-9 at 3.)[3]

Later that afternoon, plaintiff called McCain Gallahar ("Gallahar"), an assistant in defendant's Human Resources Department, and requested the paperwork necessary for taking

---

[3]  It can be reasonably ascertained from the Patient Information form, (doc. 79-9 at 3), that Dr. Dodd prescribed Xanax for plaintiff's condition.

4

leave under the Family Medical Leave Act ("FMLA").  (*See* doc. 48-1 at 3.)  Gallahar then sent an email to defendant's Director of Human Resources, Monica Williams ("Williams"), asking her to provide plaintiff with FMLA application forms.  (*Id*.)

After speaking with Gallahar, plaintiff had an in-person discussion with Offner about taking FMLA leave until September 16, 2007. (Doc. 8-1 ¶ 3.)  Plaintiff informed Offner that he had visited the doctor's office and that the doctor had instructed him to take 30 days away from work.  (Doc. 43-1 at 66:23-67:3.)  Plaintiff attempted to give Offner his doctor's excuse, but Offner "didn't want to see it."  (*Id*. at 67:4-6 & 77:14-16.)  Although plaintiff was not scheduled to work on August 16, Offner told plaintiff that he should hand over his store keys unless he was in uniform and prepared to work according to company standards. (*Id*. at 67:4-10; doc. 8-1 ¶ 4; *see* doc. 48-1 at 3.)  Plaintiff replied that he needed to take care of himself and follow the doctor's instructions.  (Doc. 43-1 at 67:8-9; doc. 8-1 ¶ 5.) Dissatisfied, Offner asked for plaintiff's store keys indicating that he was terminated.  (Doc. 43-1 at 64:10-65:4, 67:8-10 & 77:13-19; doc. 8-1 ¶ 5.)

Plaintiff called Human Resources to explain what had happened between him and Offner. (Doc. 8-1 ¶ 6.)  He "was told [the decision] was up to Mr. Offner."  (*Id*.)  Gallahar sent a follow-up email to Williams, stating that "Ryan Burch has terminated his position with our company, please do not send out FMLA papers."  (Doc. 48-1 at 4.)

### C.    PLAINTIFF IS REHIRED

Following the events of August 16, 2007, plaintiff continued to request FMLA application forms from Human Resources "in hopes of getting [his] job back."  (Doc. 8-1 ¶ 7.)  On August 20, 2007, plaintiff spoke with Gallahar about acquiring the necessary paperwork, and Gallahar told plaintiff that Williams had already mailed the documents.  (Doc. 48-3 at 3-5.)  A week passed without plaintiff receiving the application forms, and plaintiff contacted Gallahar again on August 28, asking whether Human Resources had mailed the forms and whether he was still employed.  (*Id.* at 8-11.)  Gallahar told plaintiff that Williams was responsible for sending the forms, that she would speak with Williams again, and that it was her understanding that Offner terminated his employment.  (*Id.*)  After another two weeks passed without receiving the paperwork, plaintiff wrote a letter to Williams, Gallahar, Offner, and Operating Partner Scotty Scott regarding his employment status.  (Doc. 43-1 at 111, Def.'s Ex. 8.)  Plaintiff stated:

> I am writing concerning . . . my employment with the company. . . . I feel that I've not done anything wrong to be terminated.  I've talked to [Gallahar] several time[s] and ask[ed] for my FMLA papers and I haven't received them and I have talked to the Operating Partner Scotty Scott and he said he would give me a return phone call after he investigated what happened but I'm concerned because I haven't received a call or mail from anyone . . . I am ready to come back to work.

(*Id.*)

On September 18, 2007, Offner received plaintiff's letter and informed Williams that he was willing to rehire plaintiff in a lesser capacity as an Assistant General Manager.  (Doc.

48-1 at 8.)  On September 19, 2007, Offner called plaintiff, told him that he had not managed the Fairfield restaurant according to company standards, and that he could return to work as an Assistant General Manager at defendant's Adamsville restaurant.  (Doc. 48-3 at 11-16; doc. 8-1 ¶ 10.)  Plaintiff considered the decision unfair, but he accepted the offer nonetheless because he needed a job.  (Doc. 48-3 at 13; doc. 8-1 ¶ 11.)

Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") later that afternoon, charging defendant with race discrimination by paying higher salaries to white General Managers and by denying his requests to fill General Manager vacancies at restaurants located in "better areas."  (Doc. 1 at 19.)  Williams received notice of the charge on October 4, 2007, (doc. 61-1 at 1), and first notified Offner of plaintiff's charge on October 26, 2007, (*id*. at 9).  Offner does not remember when he learned of plaintiff's charge.  (Doc. 43-3 at 99:19-23 & 190:16-20.)

Plaintiff continued to experience the mental effects of his brother's murder and returned to American Family Care on September 22, 2007.  (Doc. 43-1 at 55:3-12, 130:3-9 & 134:5-7; *see* doc. 79-9 at 4.)  An unidentified physician diagnosed plaintiff with post-traumatic stress disorder, depression, and insomnia.  (Doc. 79-9 at 4.)  The physician prescribed Celexa and Ambien as medicinal treatment and referred plaintiff to Alabama Psychiatric Services for further treatment.  (*Id*. at 4-5.)

**D.    PLAINTIFF'S SECOND TERMINATION**

Plaintiff began working as an Assistant General Manager at the Adamsville restaurant on September 25, 2007.  (Doc. 43-1 at 103:9-104:3; doc. 8-1 ¶ 12; doc. 50-4 ¶ 20.)  The General Manager was Brandi Campbell ("Campbell").  (Doc. 43-2 at 11:13-12:5; doc. 43-3 at 93:4-7.)  According to plaintiff, Campbell and Offner falsely accused him of wrongdoings in order to "set [him] up" for termination.  (Doc. 8-1 ¶ 15.)  For example, Campbell left a message with plaintiff at 6:48 p.m. on October 10, 2007, stating that she hoped plaintiff would be present for a meeting scheduled at the restaurant for 6:00 p.m. that night.  (Doc. 48-3 at 18-19.)  Plaintiff's Time Clock Report indicates that he arrived at the restaurant at 5:50 p.m. that night and left at 7:03 p.m.  (Doc. 79-8 at 1.)  Offner left a similar message the following day at 10:59 a.m., stating that plaintiff was scheduled to open the restaurant that morning, that it was after 10:00 a.m., and that he was not at the restaurant.  (Doc. 48-3 at 20.)  Offner concluded the message with, "You've got five minutes to return my call, (inaudible) get to work, or you can just give me your damn keys.  This doesn't work."  (*Id*. at 20.)  Plaintiff's Time Clock Report indicates that he arrived at the restaurant at 9:28 a.m. that morning and left at 6:40 p.m.  (Doc. 79-8 at 1.)

Defendant maintained a cash handling policy that all management employees were required to sign.  (Doc. 43-3 at 138:23-139:2 & 199:3-4.)  The cash handling policy set forth defendant's procedures as to when cash deposits were to be made, where cash was to be stored prior to deposit, cash counts, and audits.  (*Id*. at 139:18-140:11.)  Plaintiff had

reservations about signing the policy because it required employees to leave money in the restaurant after closing, and theft was prevalent at the Adamsville restaurant.  (Doc. 43-1 at 107:21-108:7.)  Plaintiff believed that he would be blamed and ultimately terminated if money was stolen overnight.  (*Id*. at 107:21-108:7 & 108:13-18.)

On October 14, 2007, Campbell called Offner to inform him that plaintiff refused to sign the cash handling policy.  (*Id*. at 107:19-108:12.)  Plaintiff was present when Campbell called Offner, and plaintiff had the opportunity to speak with Offner about his concerns with leaving money in the restaurant overnight.  (*Id*. at 108:12-13.)  Offner agreed with plaintiff's assessment of the policy and agreed to revise the policy accordingly.  (*Id*. at 108:19-109:2.)  Plaintiff told Offner that he needed to see the revisions in writing, to which Offner responded "okay."  (*Id*. at 109:1-2.)  Plaintiff intended to sign the policy after the agreed-upon revisions were made.  (*Id*. at 121:10-15.)  Offner then asked to speak with Campbell again.  (*Id*. at 109:2-7.)

Later that same day, Campbell approached plaintiff and told him that Offner had instructed her to retrieve plaintiff's restaurant keys because he was being terminated.  (*Id*. at 109:7-110:1.)  Plaintiff handed over his store keys and left the store.  (Doc. 43-2 at 21:20-21.)  Offner testified that plaintiff resigned by refusing to sign the cash handling policy.  (Doc. 43-3 at 143:8-15.)

A month later, plaintiff filed an amended EEOC charge adding a claim of retaliation for his October 14, 2007 termination along with other new claims of discrimination.  (Doc.

8-1 ¶ 16; *see* doc. 1 at 20-21.)

**E.      ALLEGED INSTANCES OF DISCRIMINATION**[4]

   **1.      Denial of Transfer to "Better Areas"**

   The Fairfield restaurant where plaintiff served as General Manager was located in a crime-ridden neighborhood.  (Doc. 43-1 at 44:3-8.)  Plaintiff requested to be transferred to vacant General Manager positions at restaurants located in "better areas" on four separate occasions.  (*Id.* at 82:13-18 & 87:20-88:4; doc. 1 at 19.)  Twice, plaintiff requested to fill openings at defendant's Hueytown restaurant.  (Doc. 43-1 at 82:16-17 & 88:1-2.)  Todd Datema, a white male, filled the position after plaintiff's first request.  (*Id.* at 82:19-83:16; doc. 43-3 at 97:16-20.)  Campbell, a white female, filled the position after plaintiff's second request.  (Doc. 43-1 at 84:1-3; doc. 43-3 at 97:13-15.)  Plaintiff also requested to fill vacancies at defendant's Forestdale and Adamsville restaurants, but Campbell filled the position on both occasions.  (Doc. 43-1 at 84:19-85:9 & 86:4-87:19.)  Plaintiff testified that each General Manager position required the same set of job skills and that each General Manager could perform the job of General Manager regardless of the restaurant to which they were assigned.  (*Id.* at 120:7-13.)

   **2.      Denial of Vacation Leave**

   General Managers were allotted "five to ten" vacation days per year during plaintiff's employment.  (Doc. 43-3 at 111:10-15.)  Throughout 2005 and 2006, plaintiff repeatedly

---

   [4] Plaintiff also alleges that the events surrounding his October 14, 2007 termination are indicative of race discrimination.

asked Offner for vacation leave.  (Doc. 43-1 at 111:18-112:7 & 120:14-19.)  Offner denied plaintiff's requests each time, telling plaintiff that the Fairfield restaurant was shorthanded and that his vacation time would "roll over to the next year."  (*Id*. at 112:1-7.)   Plaintiff remembers sending members of his staff to cover the shifts of other General Managers taking vacation.  (*Id*. at 112:8-19 & 113:6-12.)

### 3.    Receipt of Lesser Wages

Plaintiff was paid a bi-weekly salary of $1,350.00 on the date he was terminated as General Manager.  (Doc. 57 at 11.)  Plaintiff was Offner's most experienced General Manager by a period of 14 months, (*id*. at 11-13),[5] and the Fairfield restaurant where plaintiff served as General Manager was routinely ranked as Offner's top performing restaurant on weekly computer rankings generated by Offner and the Operating Partners, (doc. 43-1 at 97:14-99:4).   Plaintiff also received defendant's "Courage Under Fire" award for the Alabama region in 2005 and 2006, the annual award presented to the General Manager "displaying courage and tenacity under difficult situations."  (*Id*. at 125:17-126:2; doc. 50-4 ¶ 2.)

---

[5]   Although plaintiff asserts that defendant's payroll records, (doc. 57 at 11-13), establish that he had more experience than Offner's other General Managers as of August 16, 2007, the court cannot discern how plaintiff arrives at this conclusion.  Nevertheless, plaintiff asserted as much in his opposition brief as an undisputed fact, (doc. 78-1 at 57), and defendant does not dispute the accuracy of plaintiff's assertion in reply, (doc. 80 at 1-2).  The court therefore accepts this fact as true for summary judgment purposes.  (*See* doc. 14-1 at 6 [setting forth this court's summary judgment requirements and stating that all material facts asserted by the nonmovant will be deemed admitted for summary judgment purposes unless controverted by the statement of the movant].)

Notwithstanding plaintiff's experience and accolades, seven of the twelve white General Managers who reported to Offner at some point between 2006 and 2007 received a higher bi-weekly salary than plaintiff: Jim Ajamian, Todd Datema, Kimberly Doros, Matthew McCormick, Shannon Medina, Shellie Speegle, and Thomas Benjamin. (Doc. 57 at 11-13.) Plaintiff testified that Offner admitted to setting the salaries of his General Managers. (Doc. 43-1 at 96:2-8.) Offner testified that he merely made salary recommendations to the Operating Partners based on such factors as experience, past performance, and store volume, and that the Operating Partners set the General Managers' salaries based on his recommendations. (Doc. 43-3 at 119:2-15 & 122:2-5.) Offner testified that the Operating Partners never rejected or questioned his salary recommendations during plaintiff's tenure as General Manager. (*Id*. at 122:15-123:6.) Offner further testified that defendant's Vice President Steve Sanders instructed Gallahar to falsify salary reports in defendant's profit system so that General Managers and Assistant General Managers could not accurately compare salaries. (*Id*. at 172:18-173:4, 173:19-174:3 & 175:14-176:1.)

## F.    PROCEDURAL HISTORY

The Complaint raises the following claims: Count I - interference and retaliation in violation of the FMLA, 29 U.S.C. § 2601, *et seq*.; Count II - race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. ("Title VII") and 42 U.S.C. § 1981 ("section 1981"); Count III - retaliation in violation of Title VII and section 1981; and Count IV - gender discrimination in violation of the Equal Pay Act of 1963, 29

U.S.C. § 206(d)(1) ("EPA").  (*See generally* doc. 1.)  Defendant moves for summary

judgment on all claims.

### III.  <u>DISCUSSION</u>

**A.  FAMILY MEDICAL LEAVE ACT**

Generally, an employee may raise one of two basic types of FMLA claims: one based

on the employer's denial of or interference with the employee's substantive rights under the

FMLA, and the other based on the employer's discrimination or retaliation against the

employee for engaging in activity protected under the FMLA.  The Eleventh Circuit has held:

> Among the substantive rights granted by the FMLA to eligible employees are
> the right to "12 workweeks of leave during any 12-month period . . . [b]ecause
> of a serious health condition that makes the employee unable to perform the
> functions of the position of such employee," 29 U.S.C. § 2612(a)(1), and the
> right following leave "to be restored by the employer to the position of
> employment held by the employee when the leave commenced" or to an
> equivalent position, 29 U.S.C. § 2614(a)(1).  To preserve the availability of
> these rights, and to enforce them, the FMLA creates two types of claims:
> interference claims, in which an employee asserts that his employer denied or
> otherwise interfered with his substantive rights under the Act, *see* 29 U.S.C.
> § 2615(a)(1), and retaliation claims, in which an employee asserts that his
> employer discriminated against him because he engaged in activity protected
> by the Act, *see* 29 U.S.C. § 2615(a)(1) & (2) . . . .

*Strickland v. Water Works & Sewer Bd.*, 239 F.3d 1199, 1206 (11th Cir. 2001).

"To state a claim of interference with a substantive right, an employee need only

demonstrate by a preponderance of the evidence that he was entitled to the benefit denied."

*Id*. at 1206-07 (citing *O'Connor v. PCA Family Health Plan, Inc.,* 200 F.3d 1349, 1353-54

(11th Cir. 2000); *King v. Preferred Technical Group,* 166 F.3d 887, 891 (7th Cir. 1999)).

Alternatively, an employee may demonstrate that his employer interfered with an FMLA benefit. *O'Conner*, 200 F.3d at 1353-54.  "In contrast, to succeed on a retaliation claim, an employee must demonstrate that his employer intentionally discriminated against him in the form of an adverse employment action for having exercised an FMLA right." *Strickland*, 239 F.3d at 1207 (citing *King*, 166 F.3d at 891).

Plaintiff raises both interference and retaliation claims.  Plaintiff claims that defendant retaliated against him for engaging in protected FMLA activity by terminating his employment on August 16, 2007.[6]  Plaintiff further claims that, after August 16, 2007, defendant interfered with his substantive rights under the FMLA by failing to send him FMLA application forms, by providing false information about his eligibility for FMLA leave, by falsely claiming he was ineligible for leave, and by denying his FMLA request.

Before an actionable FMLA interference or retaliation claim may be raised, a court must find that the plaintiff has affirmatively established entitlement to FMLA leave.  *See Barker v. R.T.G. Furniture Corp.*, 375 F. App'x 966, 968 (11th Cir. 2010) (per curiam) ("Both retaliation and interference claims require a plaintiff to establish a serious health

---

[6]   There is a question whether the Complaint raises a retaliation claim based on Offner's termination of plaintiff on August 16, 2007.   In the Complaint, plaintiff seems to plead alternative versions of the facts.  On one hand, plaintiff alleges that Offner terminated his employment on August 16, 2007.  On the other hand, plaintiff repeatedly alleges that he took FMLA leave and that Offner demoted him to Assistant General Manager after plaintiff returned from FMLA leave.  The Federal Rules of Civil Procedure permit plaintiffs to allege inconsistent statements of a claim, *see* FED. R. CIV. P. 8(d)(2), but plaintiff's retaliation claim appears to be entirely predicated on the allegation that he took FMLA leave and was subsequently demoted.  Nonetheless, the court pretermits discussion on this matter because plaintiff cannot establish that he suffered from an FMLA-qualifying "serious health condition."

condition." (citing *Russell v. N. Broward Hosp.*, 346 F.3d 1335, 1340 (11th Cir. 2003))).

Employees are entitled to FMLA leave when a "serious health condition . . . makes the

employee unable to perform the functions of the position of such employee." 29 U.S.C. §

2612(a)(1)(D). The FMLA defines "serious health condition" as "an illness, injury,

impairment, or physical or mental condition that involves – (A) inpatient care in a hospital,

hospice, or residential medical care facility; or (B) continuing treatment by a health care

provider." 29 U.S.C. § 2611(11). It is undisputed that plaintiff never received inpatient care

for his health condition; therefore, the applicability of the FMLA here hinges on whether

plaintiff can establish that his health condition involved "continuing treatment by a health

care provider."

The FMLA does not define "continuing treatment by a health care provider," but the

Department of Labor has promulgated regulations defining the phrase, in relevant part, as

follows:

> (2) . . . A serious health condition involving continuing treatment by a
> health care provider includes any one or more of the following:
>
> (i) A period of incapacity (i.e., inability to work, attend school or
> perform other regular daily activities due to the serious health condition,
> treatment therefor, or recovery therefrom) of more than three
> consecutive calendar days, and any subsequent treatment or period of
> incapacity relating to the same condition, that also involves:
>
> > (A) Treatment two or more times by a health care provider, by a
> > nurse or physician's assistant under direct supervision of a health
> > care provider, or by a provider of health care services (e.g.,
> > physical therapist) under orders of, or on referral by, a health care
> > provider; or

> (B) Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider.

29 C.F.R. § 825.114(a)(2)(i)(A) & (B) (2007).[7]  "Mental illness resulting from stress . . . may be [a] serious health condition[], but only if all the conditions of this section are met."  29 C.F.R. § 825.114(c) (2007).

Thus, to demonstrate "continuing treatment by a health care provider," plaintiff must show that his health condition caused "[a] period of incapacity . . . of more than three consecutive calendar days," and that this period of incapacity "involve[d]" either "[t]reatment two or more times by a health care provider" or one instance of "[t]reatment by a health care provider . . . which result[ed] in a regimen of continuing treatment" under the health care provider's supervision.  29 C.F.R. § 825.114(a)(2)(i)(A) & (B).  "Treatment" includes "examinations to determine if a serious health condition exists and evaluations of the condition."  29 C.F.R. § 825.114(b) (2007).  "Under paragraph (a)(2)(i)(B), a regimen of continuing treatment includes, for example, a course of prescription medication (e.g., an

---

[7]    The Department of Labor amended 29 C.F.R. § 825.114 (2007) after the events giving rise to this case occurred.  The revised and renumbered language pertaining to "continuing treatment by a health care provider" is now found in the current 29 C.F.R. § 825.115 (2013).  The former version of the regulation governs the disposition of this case because the retroactive application of administrative regulations is unwarranted unless the language of the regulation requires retroactivity and Congress specifically authorized the agency to promulgate retroactive regulations.  *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).  Both parties appear to concede this point by citing to the former version of the regulation.

antibiotic) or therapy requiring special equipment to resolve or alleviate the health condition

(e.g., oxygen)." *Id*. However,

> the taking of over-the-counter medications such as aspirin, antihistamines, or salves; or bed-rest, drinking fluids, exercise, and other similar activities that can be initiated without a visit to a health care provider, is not, by itself, sufficient to constitute a regimen of continuing treatment for purposes of FMLA leave.

*Id*.

Defendant argues that plaintiff's mental condition following his brother's murder did not constitute a "serious health condition" because (1) plaintiff admitted in his deposition that "[he] could perform the job as GM" following his brother's murder, and (2) plaintiff never received "continuing treatment by a health care provider" as defined by the applicable regulations. In response, plaintiff contends that defendant takes this purported "admission" out of context and that he received "continuing treatment by a health care provider" because he "was treated by a physician on at least one occasion which resulted in a regimen of continuing care under the supervision of a physician . . . ." (Doc. 78-1 at 81-82.) The court addresses each of defendant's arguments in turn.

### 1.     Serious Health Condition - Period of Incapacity

The record evidence presents a question of fact as to whether plaintiff was incapacitated from August 16, 2007, through September 16, 2007 — a time frame well in excess of three consecutive calendar days. Plaintiff testified that "everything" regarding his brother's murder "crashed down on [him]" on August 16, 2007. (Doc. 43-1 at 138:6-9.)

17

The medical evidence corroborates plaintiff's testimony because Dr. Dodd diagnosed plaintiff with anxiety, insomnia, disturbances of emotion, and depression on August 16, 2007, and recommended that plaintiff take FMLA leave until September 16, 2007. (Doc. 79-9 at 1, 3 & 6.)  Plaintiff did testify that "[he] could perform the job as GM" following his "reaction" to his brother's murder, (doc. 43-1 at 136:16-21), but this "admission" does not necessarily mean plaintiff was capable of performing his job duties as General Manager from August 16, 2007, through September 16, 2007.  Moreover, when later asked by defendant's counsel to identify a single day following his brother's murder where he was capable of serving as General Manager, plaintiff testified "when the doctor returned me back to work" on September 16, 2007.  (*Id*. at 142:15-22; *see* doc. 79-9 at 6.)

Because plaintiff's testimony and the medical evidence raise a question of fact regarding whether plaintiff was incapacitated from August 16, 2007, through September 16, 2007, the court proceeds to the question of whether this period of incapacity involved "continuing treatment by a health care provider."

## 2.   Serious Health Condition - Continuing Treatment

The September 22, 2007 treatment at American Family Care, which resulted in plaintiff obtaining a prescription for Celexa and Ambien and a referral to Alabama Psychiatric Services, cannot be considered in determining whether plaintiff received "continuing treatment by a health care provider" under 29 C.F.R. § 825.114(a)(2)(i)(A) or (B) because it occurred after plaintiff's period of incapacity subsided.  The Tenth Circuit

addressed a similar situation in *Jones v. Denver Pub. Sch.*, 427 F.3d 1315 (10th Cir. 2005). In *Jones*, the Tenth Circuit considered whether the plaintiff had received "continuing treatment" pursuant to 29 C.F.R. § 825.114(a)(2)(i)(A) because he had been treated for his back condition on two occasions. *Id*. at 1319-20. The Tenth Circuit held that the plaintiff had not received "continuing treatment" as defined by 29 C.F.R. § 825.114(a)(2)(i)(A) because the second treatment occurred after the plaintiff's period of incapacity ended. *Id*. at 1323. The Tenth Circuit noted that "the regulation . . . frames the definition [of 'continuing treatment'] in terms of a 'period of incapacity' that 'involves' at least two treatments[, which] indicates that the timing of the treatments, and not just the need for treatments, is important." *Id*. at 1321. After thoroughly parsing the language of 29 C.F.R. § 825.114(a)(2)(i), the Tenth Circuit concluded that in order to constitute a "serious health condition" for FMLA purposes, "the health condition must be sufficiently serious that it entails an absence of more than three consecutive calendar days ***during which*** the employee obtained treatment by a health care provider at least two times (or one time followed by a regimen of continuing treatment)." *Id*. (emphasis added); *see also Branham v. Gannett Satellite Info. Network, Inc.*, 619 F.3d 563, 571 (6th Cir. 2010) (citing *Jones* and finding that "the second treatment must occur during the same period of incapacity as the first" under 29 C.F.R. § 825.114(a)(2)(i)(A)); *Lightfoot v. Dist. of Columbia*, No. 04-1280 (RBW), 2006 WL 54430, at *6 (D.D.C. Jan. 10, 2006) (finding *Jones*'s reasoning persuasive).

The court finds the Tenth Circuit's holding in *Jones* as the proper reading of the regulations. A serious health condition does not exist simply because an employee, at any given time, receives two instances of medical treatment or one instance of medical treatment resulting in "a regimen of continuing treatment." As *Jones* noted, an "indefinite timeframe" for the receipt of "continuing treatment," "defies the text [of the FMLA], runs contrary to Congress's intent, and places employers in a position of grave uncertainty in complying with their obligations under the FMLA." *Id*. at 1320. A health condition is sufficiently serious for FMLA purposes only when the requisite treatment or treatments are temporally linked to the plaintiff's incapacitation period. Accordingly, plaintiff cannot demonstrate the receipt of "continuing treatment by a health care provider" based on his September 22, 2007 treatment at American Family Care because his alleged period of incapacity ended on September 16, 2007.

The August 16, 2007 treatment from Dr. Dodd was the only medical treatment that plaintiff received between August 16, 2007, and September 16, 2007. As noted above, an individual shows "continuing treatment by a health care provider" based on one instance of medical treatment by demonstrating that the treatment "result[ed] in a regimen of continuing treatment." 29 C.F.R. § 825.114(a)(2)(i)(B). Dr. Dodd indicated that he wanted plaintiff to take FMLA leave, and he placed plaintiff on "a regimen of continuing treatment" by prescribing Xanax. Plaintiff, however, never filled the prescription. Therefore, the court

20

must answer the interesting question of whether this treatment "result[ed] in a regimen of continuing treatment," notwithstanding plaintiff's failure to actually take the medication.

The court has uncovered one case addressing this issue.  In *D'Amico v. Compass Group USA, Inc.*, 198 F. Supp. 2d 18 (D. Mass.), *aff'd*, 52 F. App'x 524 (1st Cir. 2002), the plaintiff, who had previously complained of depression, fainted on the job and was taken to the hospital where he remained unconscious for four hours.  *Id*. at 20.  The attending physician prescribed anti-depressant medication and recommended that the plaintiff take a week away from work.  *Id*.  The plaintiff never sought subsequent treatment.  *Id*. at 22-23.  After being terminated approximately one year later, the plaintiff filed an FMLA retaliation suit claiming that his termination stemmed from his requesting and taking FMLA leave.  *Id*.  The United States District Court for the District of Massachusetts ultimately granted summary judgment on plaintiff's FMLA claims, *id*. at 24, but it concluded that the plaintiff suffered from a "serious health condition involving continuing treatment by a health care provider" based upon his receipt of prescription medication, *id*. at 23.  The court reached this conclusion in the absence of evidence suggesting that the plaintiff took the medication.  *Id*.  The court stated,

> While defendants argue that there is no evidence that [plaintiff] even took the [prescription medication], and hence followed no "course" of treatment, a patient's failure to cooperate with a prescribed regimen of care cannot reasonably be perceived to invalidate the doctor's diagnosis that the patient's medical condition is worthy of treatment.

*Id*. On appeal, the First Circuit affirmed the district court's decision, but it cast doubt on the correctness of the district court's finding that the plaintiff suffered from a "serious health condition," stating that it "d[id] not necessarily accept [the district court's] conclusion that appellant met the FMLA threshold requirement[] of suffering from a 'serious health condition.'" *D'Amico v. Compass Group, USA, Inc.*, 52 F. App'x 524, 526 (1st Cir. 2002). Given this statement, the court considers the persuasive value of the district court's holding in *D'Amico* to be limited.

The Secretary of Labor expressed an opinion contrary to the district court in *D'Amico* in a 1996 Opinion Letter addressing the question, "What if the employee does not have the prescription filled or does not follow the doctor's orders?" DOL Opinion Letter, FMLA-87, 1996 WL 1044784, at *3 (Dec. 12, 1996). The Secretary of Labor adopted the position that "[a]n employee who does not follow the doctor's instructions is probably not under a 'regimen of continuing treatment by or under the supervision of the health care provider' within the meaning of the FMLA regulations." *Id*.

The court views the Secretary of Labor's opinion as the sounder interpretation of 29 C.F.R. § 825.114(a)(2)(i)(B) and the plain language of the FMLA. The court reads 29 C.F.R. § 825.114(a)(2)(i)(B) as contemplating that an individual prescribed to "a regimen of continuing treatment" must participate in that "regimen of continuing treatment" to some degree in order to fall within the ambit of the regulation. In other words, treatment by a health care provider only "***results*** in a regimen of continuing treatment" when the patient

participates in the prescribed "regimen of continuing treatment" to some extent.  It strains credulity to hold that the mere placement on or prescription to "a regimen of continuing treatment" transforms a health condition into an FMLA-qualifying "serious health condition ***involving continuing treatment***" when no participation in the "regimen of continuing treatment" actually occurs.  The opinion in *D'Amico* appears to conflate the question of whether a health condition "involves continuing treatment" with the question of whether the health care provider believes "continuing treatment" is necessary.  *Cf. Seidle v. Provident Mut. Life Ins. Co.*, 871 F. Supp. 238, 246 (E.D. Pa. 1994) ("[T]he only issue before this Court is whether the particular [medical condition] . . . constitutes a 'serious health condition' *as defined legally by the FMLA and its implementing regulations, not as defined by the medical community*." (emphasis in original)).  Under *D'Amico*'s reasoning, a patient who neglects to attend a scheduled follow-up treatment could theoretically demonstrate "continuing treatment by a health care provider" under 29 C.F.R. § 825.114(a)(2)(i)(A) by showing that his health care provider believed that further in-person treatment was necessary.  29 C.F.R. § 825.114(a)(2)(i)(A) makes clear, however, that the actual receipt of additional treatment is required to demonstrate "continuing treatment" under its provisions.  Likewise, the court concludes that the actual participation in the prescribed "regimen of continuing treatment," not the health care provider's belief that "a regimen of continuing treatment" is necessary, is required to demonstrate "continuing treatment" under 29 C.F.R. § 825.114(a)(2)(i)(B).

23

Based on the foregoing, the court finds the evidence presented insufficient to create a genuine dispute of material fact regarding whether plaintiff suffered from a "serious health condition," the threshold requirement for FMLA protection.  Specifically, plaintiff cannot demonstrate that his health condition "involv[ed] continuing treatment by a health care provider" because he did not participate in the "regimen of continuing treatment" prescribed by Dr. Dodd on August 16, 2007, and plaintiff did not receive subsequent medical treatment until September 22, 2007, six days after his alleged period of incapacity ended.  Because plaintiff cannot establish that his mental condition constituted a "serious health condition," summary judgment is due to be granted on plaintiff's FMLA interference and retaliation claims.

## B.    RACE DISCRIMINATION - TITLE VII & 42 U.S.C. § 1981

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). For any claim brought pursuant to Title VII, "the plaintiff bears the ultimate burden of proving discriminatory treatment by a preponderance of the evidence." *Crawford v. Carroll*, 529 F.3d 961, 975 (11th Cir. 2008) (citation and internal quotation marks omitted).  Absent direct evidence, a plaintiff may rely upon circumstantial evidence to prove discriminatory intent under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Crawford*, 529 F.3d at 975-76.  "Under this framework, if the plaintiff

establishes a prima facie case, the burden shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for the adverse employment action." *Id*. at 976 (quoting *McDonnell Douglas*, 411 U.S. at 802). The employer's burden is very light: "the defendant need not persuade the court that its proffered reasons are legitimate; the defendant's burden is merely one of production, not proof." *Cooper v. S. Co.*, 390 F.3d 695, 725 (11th Cir. 2004) (citation and internal quotation marks omitted), *overruled on other grounds by Ash v. Tyson Foods, Inc.*, 546 U.S. 454 (2006). If the employer is able to meet this burden, the plaintiff is afforded the opportunity to demonstrate that the employer's proffered reason for the adverse employment action is merely a pretext for discrimination. *Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997) (citing *McDonnell Douglas*, 411 U.S. at 804).

Section 1981 has been described as "a parallel remedy against discrimination which . . . derive[s] its legal principles from Title VII." *Blum v. Gulf Oil Corp.*, 597 F.2d 936, 938 (5th Cir. 1979) (citations omitted). Section 1981 claims "have the same requirements of proof and use the same analytical framework" as Title VII claims. *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).

Plaintiff raises five claims of race discrimination in the Complaint: (1) defendant paid similarly situated white General Managers higher salaries; (2) plaintiff was denied timely pay raises; (3) plaintiff was not considered for vacant General Manager positions located in "better areas"; (4) plaintiff was denied vacation leave; and (5) plaintiff's second termination

25

on October 14, 2007, was racially motivated.  The court will not address plaintiff's disparate

discipline claim, which he raises for the first time in his opposition brief.  *See*, *e.g.*, *Gilmour*

*v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314-15 (11th Cir. 2004) ("At the summary

judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the

complaint in accordance with Fed. R. Civ. P. 15(a). A plaintiff may not amend her complaint

through argument in a brief opposing summary judgment.").  The court will also not address

plaintiff's disparate pay raise claim because plaintiff provides no argument regarding this

claim in opposition.  *See*, *e.g.*, *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599

(11th Cir. 1995) ("[T]he onus is upon the parties to formulate arguments; grounds alleged

in the complaint but not relied upon in summary judgment are deemed abandoned.");

*Burnette v. Northside Hosp.*, 342 F. Supp. 2d 1128, 1140 (N.D. Ga. 2004) ("Failure to

respond to the opposing party's summary judgment arguments regarding a claim constitutes

an abandonment of that claim and warrants the entry of summary judgment for the opposing

party.").

### 1.     Wage Discrimination

A plaintiff establishes a prima facie case of wage discrimination under Title VII or

section 1981 by demonstrating that: "(1) [he] was a member of a protected class; (2) [he]

received low wages; (3) similarly situated employees outside the protected class received

higher pay; and (4) [he] was qualified to receive the higher pay."  *Gray v. City of*

*Jacksonville*, 492 F. App'x 1, 4 (11th Cir. 2012) (citing *Cooper*, 390 F.3d at 735).  Only the

third element is in dispute.  An appropriate comparator is one who is "similarly situated in all relevant respects," *Holifield*, 115 F.3d at 1562 (citations omitted), in order "to prevent courts from second-guessing a reasonable decision by the employer."  *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004) (citation omitted).  That means the plaintiff must be "matched with a person or persons who have very similar job-related characteristics and who are in a similar situation to determine if the plaintiff has been treated differently than others who are similar to him."  *MacPherson v. Univ. of Montevallo*, 922 F.2d 766, 774 n.16 (11th Cir. 1991).  "The plaintiff must show that he shared the same type of tasks as the comparators."  *Lee v. Mid-State Land & Timber Co.*, 285 F. App'x 601, 606 (11th Cir. 2008) (citing *Cooper*, 390 F.3d at 735).

Although defendant's payroll records, (doc. 57 at 11-13), indicate that seven white General Managers received a higher bi-weekly salary than plaintiff, plaintiff makes no argument as to why these individuals were "similarly situated in all relevant respects." Instead, plaintiff focuses his argument on defendant's falsified salary reports, missing and/or destroyed personnel information, and the discrepancies in salary.  (Doc. 78-1 at 69-71.) Plaintiff presumably believes that these individuals are suitable comparators simply because they also held the job title "General Manager."  Plaintiff's showing resembles that of the plaintiff in *Hooper v. Total Sys. Servs., Inc.*, 799 F. Supp. 2d 1350 (M.D. Ga. 2011), who "relie[d] merely on a comparison of generic job titles and point[ed] to little or no evidence regarding the actual job functions and the skill and effort required to perform those

27

functions." *Id*. at 1364. "A comparison of generic job titles," by itself, is insufficient to show that comparators are similarly situated, *id*., and the court's independent review of the record reveals no evidence regarding the actual job functions of General Managers, much less evidence establishing that plaintiff and his proffered comparators shared the same types of tasks. To the contrary, plaintiff testified that "[t]he job, the environment, [and] the volume," differed from restaurant to restaurant. (Doc. 43-1 at 118:16-21.) Plaintiff did testify that the same set of job skills were required of each General Manager, but this scant evidence does not demonstrate that plaintiff and his comparators were similarly situated under the prevailing standard. Accordingly, the court concludes that plaintiff cannot demonstrate the third element of his prima facie case. Summary judgment is therefore due to be granted on plaintiff's wage discrimination claim.

### 2.      Denial of Vacation Leave

The basic prima facie formulation for claims of disparate treatment under Title VII or section 1981 requires that the plaintiff show: "(1) he is a member of a protected class; (2) he suffered an adverse employment action; and (3) similarly situated employees, not of the plaintiff's protected group, were treated differently." *Cabrera v. Sec'y, Dep't of Transp.*, 468 F. App'x 939, 941 (11th Cir. 2012) (citing *Wilson*, 376 F.3d at 1087). Defendant contends that plaintiff cannot make this prima facie showing as to his discriminatory denial of vacation claim because "there is no record evidence of the circumstances under which Plaintiff made vacation requests prior to 2007 . . . or the identity and circumstances of white employees who

under nearly identical circumstances were granted such requests." (Doc. 44 at 22.)  Plaintiff provides little in opposition, simply reiterating that Offner denied his vacation requests and that he routinely sent his employees to other stores "so that . . . white general managers could take vacation." (Doc. 78-1 at 71-72.)

Although plaintiff "remember[s] having to send different managers over to run different people's restaurants while they were on vacation," he cannot specifically identify any white General Manager who was granted vacation leave under comparable circumstances. (Doc. 43-1 at 112:8-19).  "If a plaintiff cannot identify a similarly situated comparator who was treated more leniently than himself, then 'summary judgment is appropriate where no other evidence of discrimination is present.'"  *Thomas v. Dep't of Corr.*, 377 F. App'x 873, 879 (11th Cir. 2010) (quoting *Holifield*, 115 F.3d at 1562).  No other evidence of discrimination is present here, entitling defendant to judgment as a matter of law on this claim.

### 3.    Denial of Transfer to "Better Areas"

To establish a prima facie case for discriminatory failure to transfer, the plaintiff must demonstrate that he or she: "(1) is a member of a protected class, (2) was qualified for the position, (3) suffered an adverse employment action, and (4) someone outside of the protected class was hired into the position."  *Smith v. Ala. Dep't of Corr.*, 145 F. Supp. 2d 1291, 1297 (M.D. Ala. 2001) (citing *Hinson v. Clinch County, Ga. Bd. of Educ.*, 231 F.3d 821, 828 (11th Cir. 2000)).  Defendant contends that failing to transfer plaintiff to restaurants

located in "better areas" did not amount to an adverse employment action.  Here again, plaintiff offers no relevant argument in opposition.

In order for a denial of transfer to constitute an adverse employment action, the prospective transfer must involve "an increase in pay, prestige or responsibility" or otherwise materially alter the employee's employment status for the better. *Id*. at 1298 (quoting *Morris v. Wallace Cmty. College-Selma*, 125 F. Supp. 2d 1315, 1328 (S.D. Ala. 2001), *aff'd*, 34 F. App'x 388 (11th Cir. 2002)) (internal quotation marks omitted); *Harney v. McCatur, Inc.*, No. CV-11-S-4103-NE, 2012 WL 2479630, at *7 (N.D. Ala. June 26, 2012).  Denial of a purely "lateral career move" or "lateral transfer" does not amount to an adverse employment action. *See Smith*, 145 F. Supp. 2d at 1298; *see also Njie v. Regions Bank*, 198 F. App'x 878, 883 (11th Cir. 2006) (finding that the plaintiff's transfer to a managerial position at another branch location was a "lateral career move," and, therefore, "could not be described as an adverse employment action.").  The record lacks evidence indicating that a transfer to the Hueytown, Adamsville, or Forestdale restaurants involved "an increase in pay, prestige or responsibility" or any other tangible alteration in plaintiff's employment status.  In fact, Campbell filled the vacancies three of the four times plaintiff requested to be transferred, yet she received a lesser bi-weekly salary than plaintiff throughout 2006 and 2007.  (Doc. 57 at 11.)  The court therefore concludes that plaintiff cannot establish the third element of his prima facie case, and defendant is entitled to judgment as a matter of law on this claim.

30

### 4.    October 14, 2007 Termination

"To establish a prima facie case of discriminatory discharge, the plaintiff must show that [he] (1) was a member of a protected class, (2) was qualified for the job, (3) suffered an adverse employment action, and (4) was replaced by someone outside the protected class." *Cuddeback v. Fla. Bd. of Educ.*, 381 F.3d 1230, 1235 (11th Cir. 2004) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)).   Alternatively, a plaintiff may demonstrate a prima facie case of discriminatory discharge by showing "that he is a member of a protected class, that he was qualified for the job from which he was fired, and 'that the misconduct for which [he] was discharged was nearly identical to that engaged in by [an employee outside the protected class] whom [the employer] retained.'" *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1185 (11th Cir. 1984) (quoting *Davin v. Delta Air Lines, Inc.*, 678 F.2d 567, 570 (5th Cir. Unit B 1982)).   Defendant argues that summary judgment is warranted based on an absence of comparator evidence.   Specifically, defendant contends that "the undisputed evidence establishes that all management employees were required to sign the [cash handling] policy, and there is no evidence that any white management employee refused to sign the policy in October 2007 but was not terminated." (Doc. 44 at 22.)

Plaintiff makes no relevant argument in his opposition brief as to this claim.   His argument in opposition focuses exclusively on his attempt to obtain FMLA leave and his subsequent termination on August 16, 2007.   (*See* doc. 78-1 at 72-73.)   Therefore, plaintiff's

discrimination claim based on his October 14, 2007 termination has been waived, and defendant is entitled to judgment as a matter of law on plaintiff's discriminatory discharge claim.  The court will not consider the merits of a discrimination claim based on plaintiff's August 16, 2007 termination because no such claim was raised in the Complaint.

## C.    RETALIATION - TITLE VII & 42 U.S.C. § 1981

Plaintiff further claims that his October 14, 2007 termination constituted an unlawful retaliatory act motivated by him filing an EEOC charge on September 19, 2007.

Anti-retaliation laws "forbid[] employer actions that 'discriminate against' an employee . . . because he has 'opposed' a practice that Title VII forbids or has 'made a charge, testified, assisted, or participated in' [an EEOC] 'investigation, proceeding, or hearing.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006) (citing 42 U.S.C. § 2000e-3(a)).  Just as with discrimination claims, "[o]nce the plaintiff establishes [a] prima facie case, the employer must proffer a legitimate, non-discriminatory reason for the adverse employment action.  If the employer offers legitimate reasons for the employment action, the plaintiff must then demonstrate that the employer's proffered explanation is a pretext for retaliation." *Holifield*, 115 F.3d at 1566 (internal citations omitted).  A plaintiff presents a prima facie case of retaliation by showing that: "(1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action; and (3) [there is] a causal link between the protected activity and the adverse action." *Bryant v. Jones*, 575 F.3d 1281,

1307-08 (11th Cir. 2009) (citing *Raney v. Vinson Guard Serv. Inc.*, 120 F.3d 1192, 1196 (11th Cir. 1997); *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993)).

Defendant only challenges the third element, arguing that plaintiff cannot establish a casual connection between his protected expression (*i.e.* the filing of the EEOC charge) and his October 14, 2007 termination.  The causal connection requirement is construed broadly, and such a connection exists between protected activity and an adverse employment action when the two events "are not completely unrelated."  *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) (citation and internal quotation marks omitted).  However, to make this showing, "a plaintiff must, at a minimum, generally establish that the defendant was . . . aware of the protected expression at the time the defendant took the adverse employment action," *Raney*, 120 F.3d at 1197 (citation omitted), and that "that there was a close temporal proximity between this awareness and the adverse . . . action," *Higdon*, 393 F.3d at 1220 (citation and internal quotation marks omitted).  "Since corporate defendants act only through authorized agents, in a case involving a corporate defendant the plaintiff must show that the corporate agent who took the adverse action was aware of the plaintiff's protected expression . . . ."  *Raney*, 120 F.3d at 1197 (citing *Goldsmith*, 996 F.2d at 1162).  This awareness requirement appeals to common sense – "A decision maker cannot have been motivated to retaliate by something unknown to him." *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000).

It is undisputed that Offner was the decisionmaker behind plaintiff's October 14, 2007 termination.  Plaintiff, however, provides no argument that Offner was aware of his September EEOC charge prior to October 14, 2007.  Plaintiff attempts to demonstrate the requisite causal nexus by presenting evidence that defendant's Human Resources Department received notice of the charge on October 4, 2007, that Campbell and Offner falsely accused him of tardiness shortly thereafter, and that Offner terminated him for not signing the cash handling policy after agreeing to revise the policy in accordance with plaintiff's suggested revisions.  Williams, defendant's Director of Human Resources, received notice of the September EEOC charge on October 4, 2007, (*see* doc. 61-1 at 1 & 6), but this knowledge cannot be imputed to Offner absent more evidence suggesting otherwise.  Furthermore, the evidence shows that Williams first notified Offner of plaintiff's charge on October 26, 2007. (*Id.* at 9.)  Although Offner cannot pinpoint the date when he learned of plaintiff's charge, he testified that he was not notified of the charge for "quite some time."  (Doc. 43-3 at 99:19-23.)  "A jury finding that [the decisionmaker] was aware of [the] protected conduct must be supported by reasonable inferences from the evidence, not mere speculation." *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1355 (11th Cir. 1999).  Based on the evidence presented, it would be mere speculation for a reasonable factfinder to conclude that Offner was aware of the September EEOC charge prior to terminating plaintiff on October 14, 2007.  Accordingly, plaintiff cannot demonstrate the causal connection element of his prima facie retaliation case, and defendant is entitled to judgment as a matter of law.

34

D.     **EQUAL PAY ACT**

Plaintiff alleges that defendant willfully violated the EPA by paying his female counterparts higher salaries.  Defendant moves for summary judgment solely on grounds that this claim is time-barred by the applicable statute of limitations.[8]

Claims brought pursuant to the EPA are subject to the time prescriptions applicable to other FLSA claims.  *See* 29 U.S.C. § 255; *Alvarez Perez v. Sanford-Orlando Kennel Club, Inc.*, 515 F.3d 1150, 1164 (11th Cir. 2008) ("[T]he  FLSA's statute of limitations . . . appl[ies] to EPA claims.").  An action is time-barred under the FLSA "unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued." 29 U.S.C. § 255(a).  Each unequal paycheck is considered a new EPA violation for purposes of the statute of limitations and "begins a new statute of limitations period as to that particular event."  *Knight v. Columbus, Ga.*, 19 F.3d 579, 582 (11th Cir. 1994); *Mitchell v. Jefferson County Bd. of Educ.*, 936 F.2d 539, 548 (11th Cir. 1991); *see also Morris*, 125 F. Supp. 2d at 1341 ("[E]ach paycheck represents a fresh violation commencing a separate limitations period. This variation of the continuing violation doctrine applies to actions under the Equal Pay Act.").  "[A]n Equal Pay Act claimant may only recover for the

---

[8]  Defendant does not challenge plaintiff's ability to establish a prima facie case under the EPA.  Nor does defendant argue that one of the four affirmative defenses to EPA liability is applicable to the instant case.

discriminatory pay received within the statute of limitations period." *Slattery v. Precision Response Corp.*, 167 F. App'x 139, 142 n.1 (11th Cir. 2006) (citation omitted).

Plaintiff commenced this action on August 14, 2009; therefore, plaintiff may recover for disparate paychecks received after August 14, 2007, for ordinary EPA violations and for disparate paychecks received after August 14, 2006, for willful violations. Defendant argues that any alleged EPA violation was an ordinary violation and that because plaintiff had not worked as General Manager for more than two years prior to the commencement of this lawsuit, his claim is time-barred absent a showing of willfulness.

The last day plaintiff worked as General Manager was on August 12, 2007, which is more than two years before plaintiff commenced this litigation. However, because an EPA cause of action accrues with the receipt of each discriminatory paycheck, the relevant inquiry is whether plaintiff received a paycheck for services rendered on or after August 14, 2007, and the evidence suggests he did. First, plaintiff remained employed until August 16, 2007, which occurred less than two years before plaintiff filed this lawsuit. Second, plaintiff remained on defendant's payroll records through August 30, 2007. (Doc. 57 at 11.) This evidence strongly suggests that plaintiff received a paycheck after August 14, 2007, and within the statute of limitations period for ordinary EPA violations. Accordingly, a question of fact exists whether defendant is entitled to judgment as a matter of law based on the EPA's two-year statute of limitations, and plaintiff need not demonstrate willfulness in order to

withstand summary judgment.   Summary judgment is therefore due to be denied on plaintiff's EPA claim.

## IV.  <u>CONCLUSION</u>

For the foregoing reasons, defendant's Motion for Summary Judgment, (doc. 43), is due to be granted in part and denied in part.  An Order in accordance with this Memorandum Opinion will be entered contemporaneously herewith.

**DONE**, this 27th day of March, 2013.

_Sharon Lovelace Blackburn_
SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE